IN THE UNITED STATES DISTRICT COURT

For the

District of North Dakota


| | |
|---|---|
| Angela Hansen<br>    B.D. (by mother and next friend<br>    Angela Hansen); and on behalf of<br>    all others similarly situated,<br><br>        Plaintiffs, injured parties.<br><br>-- against--<br><br>STATE OF NORTH DAKOTA<br>    Serve On:<br>    Wayne Stenhejem<br>    North Dakota Attorney General<br><br>NORTH DAKOTA STATE OFFICE OF<br>COURT ADMINISTRATION<br>    Serve On:<br>    Sally Holewa<br><br>NORTH DAKOTA COUNTY<br>COURT ADMINISTRATOR<br>    Serve On:<br>    Donna Wunderlich<br><br>NORTH DAKOTA ATTORNEY GENERAL<br>Wayne Stenhejem,<br>In his individual and official capacities<br>as North Dakota Attorney General<br><br>Judge Donald Jorgensen/ Estate of,<br>In his individual and official capacities as Judge<br>of the South Central Judicial District Court<br><br>Judge David E. Reich,<br>In his individual and official capacities as Judge<br>of the South Central Judicial District Court | Case No. 1:17-cv-236<br><br>Filed in Association with Cases:<br><br>2:2017-cv-02072<br>and 3:17-cv-01224<br>3:17-cv-01669-SI<br>and all others similarly situated<br><br>COMPLAINT/ CLAIM FOR<br><br>VIOLATIONS OF ADA;<br>VIOLATIONS OF SECTION 504 OF<br>THE REHABILITATION ACT<br><br><br><br>DEMAND FOR TRIAL BY JURY<br><br>without request or consent to<br>proceed before a magistrate |

Presiding Judge Gail Hagerty,                    )
In her individual and official capacities as     )
Presiding Judge of the South Central Judicial    )
District Court                                    )
Chief Justice Gerald VandeWalle,                 )
In his individual and official capacities as     )
Chief Justice of the North Dakota                )
Supreme Court                                     )
                                                  )
Judge Dale Sandstrom,                            )
In his individual and official capacities as Judge )
of the North Dakota Supreme Court                )
                                                  )
Judge Carol Ronning-Kapsner,                     )
In her individual and official capacities as Judge )
of the North Dakota Supreme Court                )
                                                  )
Judge Lisa Fair-McEvers,                         )
In her individual and official capacities as Judge )
Judge of the North Dakota Supreme Court          )
                                                  )
Judge Daniel Crothers,                           )
In his individual and official capacities as Judge )
of the North Dakota Supreme Court                )
                                                  )
Judge Richard Geiger,                            )
In his individual and official capacities as     )
Judge of the North East Judicial District Court  )
                                                  )
Sally Holewa,                                    )
In her individual and official capacities        )
as State Court Administrator                     )
                                                  )
Donna Wonderlich,                                )
In her individual and official capacities        )
as Court Administrator                           )
                                                  )
Ben C. Pulkrabek                                 )
In his individual and official capacities        )
as attorney                                      )

Rodney I. Pagel,                                          )
In his individual and official capacities                 )
as attorney                                               )
                                                          )
Barb Oliger,                                              )
In her individual and official capacities                 )
as parenting investigator                                 )
                                                          )
Allison Mahoney,                                          )
In her individual and official capacities                 )
as Parenting Coordinator                                  )
                                                          )
Family Safety Center,                                     )
Serve On:                                                 )
Diane Zainhofsky                                          )
                                                          )
Diane Zainhofsky,                                         )
In her individual and official capacities                 )
As Executive Director of the FSC                          )
                                                          )
Jamie, (refuses to give last name)                        )
In her individual and official capacities                 )
as manager/ employee of the FSC                           )
                                                          )
Michelle E, (refuses to give her last name)               )
In her individual and official capacities                 )
as Supervisor/ employee of FSC                            )
                                                          )
Steve Reiser,                                             )
In his individual and official capacities as              )
Director of the Dakota Central Social Services            )
                                                          )
Sarah Fricke,                                             )
In her individual and official capacities as              )
social worker of Dakota Central Social Services           )
                                                          )
Jane / John Does of Dakota Central SS.                    )
In their individual and official capacities               )
As social workers of DCSS                                 )
                                                          )

Alana Semchenko,                                    )
In her individual and official capacities           )
                                                    )
DAKOTA CENTRAL SOCIAL SERVICES                      )
                                                    )
NORTH DAKOTA DEPARTMENT OF                          )
HEALTH AND HUMAN SERVICES                           )
                                                    )
LEGAL SERVICES OF NORTH DAKOTA                      )
     Defendants.                 .              )

## COMPLAINT

Plaintiff, injured party, Angela Hansen alleges the following:

## INTRODUCTION

1. Angela Hansen and B.D., Hansen's youngest daughter, each a qualified individual with a mental health disability, (collectively, "Plaintiffs"), bring this complaint/ claim against the above-named Defendants, and State of North Dakota, et al. (Collectively, Defendants), who are public and/or private entities. From August 2011 through present, Defendants have regarded Plaintiffs as having a mental impairment called Parental Alienation/ Parental Alienation syndrome, undisclosed mental health issues, have made unfounded, unsubstantiated accusations of mental health issues against Plaintiff's, have regarded child, B.D. as disabled and have discriminated against Plaintiff's according to these perceived mental impairments. Defendants acted on assumptions, gross baseless allegations and sex-based stereotypes about Plaintiff's disabilities; and failed to individually analyze what service's and supports would be appropriate considering those disabilities.

2. Defendants refused to provide appropriate individualized treatment and accommodations necessary to ensure that Plaintiff's had full and equal opportunity to court proceedings to which Ms. Hansen's parental rights and child's custody were at issue. Moreover, Defendants exploited Plaintiffs' disabilities.

3. As a result of the actions, inactions and intentional omissions and the trauma caused by the Defendants to Ms. Hansen, Ms. Hansen suffers from Post-Traumatic Stress, Post-Traumatic Stress Disorder, which is a psychiatric injury and mental impairment, and Defendants

exploited that even further. Ms. Hansen also now suffers from severe fibromyalgia and has been diagnosed with an auto-immune disorder, a physiological impairment triggered by the PTS, PTSD. As a result of Defendants' discriminatory practices and exploitation of Plaintiffs' disabilities, Ms. Hansen's parental rights were effectively terminated, her child was segregated from her and her sisters and other family members, and she was barred from contact with her.

4. For more than six years, the State of North Dakota and its agencies have denied MS. Hansen and her youngest daughter, B.D. the opportunity and the right to be a family and threatens to deny them that right permanently.

5. Defendants' actions, inactions and intentional omissions here and more fully laid out in Hansen's R.I.C.O. complaint which is already on file with the Court on August 23, 2017, violate Title II of the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35; Title III of the American's with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12181 et seq., and its implementing regulation at 28 C.F.R. Part 36; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

6. Plaintiffs do not challenge or appeal any lawful state court decision.

7. This matter raises an issue of general public importance.

8. "From the Public Health Perspective: in a judicial system, a norm is established against discrimination on the basis of disability tying law closely to public health. Thus, it would seem that justice and public health in many ways are interdependent. However, public health and law are separate disciplines, and as Wendy Parmet, a leading expert on health, disability, and public health law puts it, "The legal perspective contrasts dramatically with a public health population perspective. Legal reasoning tends to rely on analogy and deductive application of rules to facts. Public health works from empirical evidence and probabilistic reasoning." Including persons with disabilities providing equal stance in courts of law necessitates a blueprint that avoids exploitation of disabilities due to legal adversarial tactics."

## JURISDICTION AND VENUE

9.   This Court has jurisdiction of this action under 28 U.S.C. § 1331, and 42 U.S.C. §§ 12133 and 12188. The Court may grant declaratory and other relief pursuant to 28 U.S.C. §§ 2201 and 2202. The Court may grant attorney's fees pursuant to 42 U.S.C. § 12205.

10.   The acts and omissions of Defendants giving rise to this action occurred in North Dakota. Plaintiffs have been situated and aggrieved in North Dakota during the entire period of the events giving rise to this action, including present unmitigated harm occurring in this district, making venue proper in this judicial district pursuant to 28 U.S.C. § 1391.

11.   Enforcement by the United States Attorney General is invoked pursuant to 42 U.S.C. §§ 12133 and 12188.

## PARTIES

12.   The United States has an interest herein.

13.   Plaintiff, injured party, Angela Hansen, was a resident of and was domiciled in North Dakota during the time of the events. As a victim of domestic violence provides here for this Court her protected Post Office box address.

14.   Plaintiff B.D. is an individual who is the born child of Angela Hansen.

15.   Defendant, State of North Dakota, including its respective departments, agencies, and other instrumentalities, is a unit of government, is a "public entity" within the meaning of 42 U.S.C. § 12131(1), and is subject to the ADA and its implementing regulation. It is responsible for the administration of the Judicial Branch of North Dakota. The State of North Dakota is a recipient of federal financial assistance. The State of North Dakota, et al. have no immunity pursuant to 42 U.S.C. § 12202.

16.   Defendants, Burleigh and Sheridan Counties, including the South Central Judicial District Court, North Dakota Supreme Court, North Dakota Attorney General's office,  including its respective departments, agencies and other instrumentalities, are each a unit of local government in the State of North Dakota, is a "Public entity" within the meaning of 42 U.S.C. § 12131(1) and

each is subject to the ADA and its implementing regulation. Each is a recipient of federal financial assistance.

17.  Defendant, State Court Administrator, Sally Holewa, whom assists the Chief Justice, District and Supreme Courts of North Dakota in their leadership role as the administrator and manager of North Dakota's judicial system, its courts, officers, and related offices and programs. The State Court Administrators Office is a recipient of federal financial assistance. This is a "public entity" and a "private entity" within the meaning of 42 U.S.C. 12131(1), and 42 U.S.C. 12181(1) respectively and is subject to the ADA and its implementing regulations. This office and Ms. Holewa are located at Office of the State Court Administrator Supreme Court Judicial Wing, 1st Floor. 600 E. Blvd. Ave. Bismarck, North Dakota. 58505-0530.

18.  Defendant, trial Court Administrator at the time of the events complained of herein, and is now the Chief Justice Appointee, Donna Wunderlich, whom oversee's the administrative operations, facilities of the trial courts Dakota in her leadership role as the administrator and manager of North Dakota's judicial system, its courts, officers, and related offices and programs. The Court Administrators office and Ms. Wunderlich are a "public" and "private" entity within the meaning of 42 U.S.C. 12131(1) and 42 U.S.C. 12181(1) respectively and are subject to the ADA and its implementing regulation. This office and Ms. Wunderlich are recipients of federal financial assistance. It is located at 514 E. Thayer Ave. P.O. Box 1013 Bismarck, North Dakota. 58502-1013.

19.  Defendant Gail Hagerty, is the Presiding Judge of the South Central Judicial District, at all times relevant to this action and can be located at P.O. Box 1013 Bismarck, North Dakota, 58502, She is being sued in her individual and official capacities.

20.  Defendant, Donald Jorgensen of the South Central Judicial District, Bismarck, North Dakota, was the initial judge assigned at the onset of the events complained of herein and is being sued in his individual and official capacities. Last known address is P.O. Box 1013 Bismarck, North Dakota. 58502-1013.

21.  Defendant, David E.  Reich is a judge of the South Central Judicial District Court, whom took over for D. Jorgensen. Mr. Reich was the trial court judge during the time of the events

complained of herein and is being sued in his individual and official capacities, he can be located at P.O. Box 1013 Bismarck, North Dakota. 58502-1013.

22.    Defendant Ben C. Pulkrabek, was the initial attorney for Shannon R. Dieterle who initiated the violations against Hansen. Pulkrabek is an attorney located at 402 First Street NW.  Mandan, North Dakota, 58554, he is being sued in his individual and official capacities.

23.    Defendant, Chief Justice, Gerald VandeWalle, was the Chief Justice of the North Dakota Supreme Court at all times relevant to this action. The last known address located at Supreme Court State Capital, 600 E. Blvd. Ave. Bismarck, North Dakota. 58505-0530. Gerald VandeWalle is being sued in his individual and in his official capacity.

24.    Defendant Rodney Pagel, is an attorney licensed by the BAR Association of State of North Dakota. He was qualified by and is a member of the State Bar of North Dakota and is an attorney. He is both a "public entity" within the meaning of 42 U.S.C. § 12131(1); and a "private entity" within the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations. He is the recipient of federal financial assistance. He is located at 1715 Burnt Boat Drive, Madison Suite. Bismarck, North Dakota.

25.    Defendant, Dale Sandstrom, is a judge of the North Dakota Supreme Court at the time of the events complained of herein, and can be located at 600 East Blvd. Ave, Bismarck, North Dakota, he is being sued in his individual and official capacities.

26.    Defendant Carol Ronning-Kapsner, is a judge of the North Dakota Supreme Court at the time of the events complained of herein, and can be located at 600 East Blvd. Ave. Bismarck, North Dakota. She is being sued in her individual and official capacities

27.    Defendant Lisa Fair-McEvers, is a judge of the North Dakota Supreme Court at the time of the events complained of herein, and can be located at 600 Blvd. Ave. Bismarck, North Dakota. She is being sued in her individual and official capacities

28.    Defendant Daniel Crothers, is a judge of the North Dakota Supreme Court at all times relevant herein and can be located at 600 East Blvd. Ave. Bismarck, North Dakota. He is being sued in his individual and official capacities.

29.   Defendant, Richard Geiger, is a judge of the North East Judicial District at all times relevant herein and can be located at Walsh County Courthouse, 600 Cooper Ave. Grafton, North Dakota. 58237-1509. He is being sued in his individual and official capacities.

30. Defendant, Wayne Stenhejem, is the attorney General for the State of North Dakota at all times relevant herein and can be located at 600 East Blvd. Ave. Dept. 125, Bismarck, North Dakota, and is being sued in his individual and official capacities.

31.   Defendant, Barb Oliger, is a court appointed parenting investigator. Ms. Oliger is a "private entity" within the meaning of 42 U.S.C. § 12181 and a "Public entity" within the meaning 42 U.S.C. 12131 and its implementing regulation. She is a recipient of federal financial assistance and is located at 1900 6th. Ave. NE. Beulah, North Dakota. 58823. She is being sued in her individual and official capacities.

32.   Defendant, Allison Mahoney, is a court appointed parenting coordinator. She is a "private entity" and a "public" entity within the meaning of 42 U.S.C. § 12181 and 42 U.S.C. 12131(1) respectively and its implementing regulation. She is a recipient of federal financial assistance and is located at 820 Bryan Trail, Mandan, North Dakota. Ms. Mahoney is also the Program manager for North Dakota's home visitation project and also employed through her position as program coordinator of Prevent Child Abuse North Dakota. She is being sued in her individual and official capacities.

33.   Defendant, Michelle E, employee of the Family Safety Center in Bismarck, North Dakota is a "private entity" within the meaning of 42 U.S.C. § 12181 and its implementing regulation. She is a recipient of federal financial assistance and is located at 218 West. Broadway Ave, Bismarck, North Dakota, 58501. She is being sued in her individual and official capacities.

34.   Defendant Diane Zainhofsky Executive Director of the AARC and the Family safety Center, who can be located at 218 West Broadway, Ave, Bismarck, North Dakota. She is a "private entity" within the meaning of 42 U.S.C. § 12181 and its implementing regulation. She is being sued in her individual and official capacities.

35.     Defendant Jamie, employee of the Family Safety Center and can be located at 218 West Broadway Ave. Bismarck, North Dakota is a "private entity" within the meaning of 42 U.S.C. §

12181 and its implementing regulation. She is a recipient of federal financial assistance. She is being sued in her individual and official capacities.

36.   Defendant, Family Safety Center, located at 218 West Broadway Ave. Bismarck, North Dakota, is a "public entity" within the meaning of 42 U.S.C. 12131(1) and is subject to the ADA and its implementing regulation, it is a recipient of federal financial assistance.

37.   Defendants, Dakota Central Social Services, is a North Dakota State agency and is the recipient of federal financial assistance and is located at P.O. Box 1108 Washburn, North Dakota. 58577. It is a public entity within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. DCSC is a recipient of federal financial assistance.

38.    Defendant Steve Reiser, is a public and private entity within the meaning of 42 U.S.C. 12181 and 42 U.S.C. 12131(1) and is subject to the ADA and its implementing regulation and is a recipient of federal financial assistance. Mr. Reiser can be located at P.O. Box 1108 Washburn, North Dakota. 58577. His duties include overseeing the implementation and operation of all district social services and human services programs and personnel administration, supported by local, state and federal funds. Ms. Reiser is being sued in his individual and official capacities.

39.    Defendant Sarah Fricke, of Dakota Central Social Services and is a public and private entity within the meaning of 42 U.S.C. 12181 and 42 U.S.C. 12131(1) and is subject to the ADA and its implementing regulation and is a recipient of federal financial assistance.  She can be located at P.O. Box 1108 Washburn, North Dakota. 58577 and is being sued in her individual and official capacities.

40.   Defendant Other Jane and John Doe's of the Dakota Central Social Services who were involved at relevant times herein, as private and/ or public entities within the meaning of 42 U.S.C. 12131(1) and 42 U.S.C. 12181. Each is subject to the ADA and its implementing regulation and is a recipient of federal financial assistance and can be located at P.O. Box 1108 Washburn, North Dakota. 58577. Each is being sued in their individual and official capacities.

41.    Defendant Alana Semchenko, PsyD, is a mental health provider licensed by and does business in the state of North Dakota. She is a private and/ or public entity within the meaning of 42 U.S.C. 12131(1) and 42 U.S.C. 12181 and is subject to the ADA and its implementing

regulation and is a recipient of federal financial assistance and can be located at 515 ½ East Broadway Ave. Bismarck, North Dakota. 58501. She is being sued in her individual and official capacities.

42.    Defendant Legal Services of North Dakota is a legal aid service in North Dakota. It is a public and/or private entity within the meaning of 42 U.S.C. 12131(1) and 42 U.S.C. 12181(1) and is subject to ADA and its implementing regulation. It is a recipient of federal financial assistance and is located at P.O. Box 1893 Bismarck, North Dakota. 58502.

FACTS

43.    At all times herein, Plaintiff Hansen is a female and is the biological mother of B.D. The United States Department of Health and Human Services (HHS) and the United States Department of Justice (DOJ) issued a technical assistance manual in August 2015, stating: "Title II of the ADA applies to the services, programs, and activities of all state and local governments throughout the United States, including child welfare agencies and court systems. The "services, programs, and activities" provided by public entities include, but are not limited to, investigations, assessments, provision of in-home services, removal of children from their homes, case planning and service planning, visitation, guardianship, adoption, foster care, and reunification services. "Services, programs, and activities" also extend to child welfare hearings, custody hearings, and proceedings to terminate parental rights."

44.    Title II authorizes suits by private citizens for money damages against public entities that violate § 12132. See 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794(a).

45.    In March 2017, Ms. Karin Wolf filed a complaint of disability discrimination and other acts prohibited by The Americans with Disabilities as Amended Act. (ADA/ ADAAA) Case No. 2:2017-cv-02072. In her complaint, she claimed her cause of action and included in her cause of action "and those similarly situated." In September 2017 Ms. Wolf has Amended this Complaint and has refiled, with the Federal Court issuing the summons via Federal Marshalls.

46.    In July 2017, Susan Skipp filed a complaint of disability discrimination and other acts prohibited by The American with Disabilities as Amended Act. (ADA/ADAAA) case no. 3:17-

cv-01224. In her complaint, she claimed her cause of action and included in her cause of action "and those similarly situated."

47.   Plaintiffs are similarly situated.

48.   In 2012 Ms. Hansen obtained dissolution by trial, this trial was based solely upon the fraud committed by Shannon R. Dieterle and his attorneys. For roughly a year prior to divorce Hansen had sought out treatment for the trauma of the domestic violence and has continued treatments post-divorce.

49.   Ms. Hansen's former husband continued to harass, stalk, terrorize Ms. Hansen and her children and also violated the protection order against him on more than one occasion, which he was arrested and jailed for. This culminated in extensive and abusive, post-divorce custody litigation, malicious litigation filed by his attorney, Rodney Pagel from 2011 through 2016, where he accused her and the child of having Parental Alienation, (PA/ PAS); and Ms. Hansen of having mental issues, none of which she nor her child has.

50.   According to the U.S. Department of Justice, gender bias against women in child custody proceedings is prevalent, especially where abuse is alleged. (Saunders report, 2012).

51.   The Association of Family and Conciliation Courts (AFCC) promotes the use of "PAS" and additional mental health issues and accusations against mothers and children in family courts.

52.   In 2012, Judge Donald Jorgensen allowed the divorce and custody case to proceed based on the perceived existence of a mental impairment, namely "PA/PAS," as a cause of action for removing the child custody from Ms. Hansen. The court did not accordingly refer Ms. Hansen or the child to a disability accommodations coordinator.

53.   It is the policy of the State of North Dakota and its agencies to use Alienation and make false and even unsupported allegations of behavioral issues and other such mental health accusations against women and children in family court proceedings. This policy has a disparate impact that adversely affects women and children.

54.    Post-divorce litigation was active from 2012 through 2016 and the case is actually still open at this time. The main divorce and custody litigation, from 2011 through 2012, a grueling year.

55.    Defendants repeatedly dragged Ms. Hansen and her children into courts to intentionally discriminate against them based on "PA/PAS" from 2011 through 2015.

56.    As a result, Ms. Hansen has been forced to suffer with Post-Traumatic Stress (PTS) and Post-Traumatic Stress Disorder (PTSD) relating to domestic violence and legal abuse, legal abuse syndrome complained of herein and has been brought to the attention of this court in Ms. Hansen's initial filing in March of 2017.

57.    Ms. Hansen also has lifelong Fibromyalgia and due to the continual legal abuse, has an Auto-immune disorder and has and is receiving treatment for these, accordingly.

From 2011 to present, the South Central Judicial District Court has regarded Plaintiffs as each having one or more mental health disabilities, mainly "PA/PAS."

58.    Ms. Hansen is a qualified individual with disabilities within the meaning of 42 U.S.C. §§ 12102 and 12131(2).

59.    "PAS" theory places a sex-based stereotype on women.

60.    According to the American Psychological Association (APA), there is no reliable empirical data to support the so-called phenomenon of "Parental Alienation Syndrome." This "syndrome" and similar ones are used almost exclusively against women.

61.    The APA has repeatedly rejected Richard Gardner's theory of "Parental Alienation Syndrome" for inclusion in the Diagnostics and Statistical Manual of Mental Disorders.

62.    The APA has also rejected attempts by Gardner's cult-like followers at rehashing and renaming "PAS" as "Parental Alienation Disorder" ("PAD").

63.    The State of North Dakota, et al., failed to inform Ms. Hansen of their policy to give preferential treatment to fathers, and that they were acting out of financial motivation, to obtain

professional fees and federal "access" grants via The Healthy Marriage and Responsible Fatherhood (HMRF) Initiative.

64.    Because Defendants regarded Ms. Hansen as having alienation and other make believe mental health issues, the court was biased against her according to this sex-based stereotype. As a result, Plaintiffs could not and were not allowed to fully and equally participate in court proceedings.

65.    Defendants did not refer Plaintiffs to a disability accommodations coordinator at the courthouse or at any other location, during the pendency of the family court proceedings, nor offer accommodations to the Plaintiffs. As a result, Plaintiffs could not fully and equally participate in court proceedings.

66.    Title II entities have not completed self-evaluations for any of the programs, policies, interagency agreements that the plaintiffs were forced to use. If such evaluations took place, harm could have been mitigated per §35.105 Self-evaluation Part (d) of this section is important because most entities purport that they did self-evaluations in 1993.

67.    However, the law changed twice, and evaluations that take in consideration these changes show a good faith effort on the entity's behalf. This is not the case here. (d) If a public entity has already complied with the self-evaluation requirement of a regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this section shall apply only to those policies and practices that were not included in the previous self-evaluation.

68.    Defendants faked the existence of a mental health impairment, namely, "PA/PAS" and other undisclosed and vague mental health issues as a cause of action for segregating Plaintiff's.

69.    Defendants stereotyped and stigmatized Ms. Hansen and repeatedly acted on the assumptions about Ms. Hansen and the "PA/PAS" and vague mental health allegations as a mental impairment.

70.    Defendants perpetuated the use of "PA/PAS" as a real syndrome to prejudice Ms. Hansen and other women in the family courts..

71.    According to the U.S. Department of Justice, "PAS" does not hold up to Daubert and Frye criteria or evidentiary standards in court. (Saunders report, 2012).

72.    State and Federal laws such as the Health Insurance Portability and Accountability Act of 1996 (HIPPA) provide that an individual has the right to privacy and nondiscrimination, the right to choose and decline their own healthcare providers, and the right to Informed Consent.

73.    Further, the Fourth Amendment protects the right to privacy, and the Fifth Amendment protects an individual from being compelled to incriminate oneself in such evaluations or therapy ordered by the Court.

74.    Defendants forced and or coerced Plaintiffs into evaluations by their actions and statements, and yet, when these evaluations were in favor of Ms. Hansen, not one of the Defendants acknowledged the existence of these, even though it is fact that these evaluations are on the record. Further, because these evaluations were in favor of Ms. Hansen, Defendant Dieterle, Pagel and aided by Reich and even an attorney of Hansen tried to force by severe duress and threats of continuing to keep Ms. Hansen's daughter from her if she did not agree to even yet several additional evaluations, whereby Dieterle and Pagel were the ones to select the provider.

75.    Defendants Dieterle, Pagel and Reich intentionally placed Ms. Hansen under extreme traumatic duress, saying that if she didn't go along with their requirement of an evaluation by someone whom they had a hand in selecting then they would not aid in reunification of Ms. Hansen and her daughter, this is clear retaliation to say the least.

76.    These three Defendants specifically tried to coerce and force Ms. Hansen into several additional evaluations where her and the child's mental health were questioned, by providers that Ms. Hansen did not choose and to whom she specifically objected to, and in fact, Ms. Hansen has provided a letter filed with the court and sent via email to the other parties, stating she did not comprehend nor did she agree. To which, the response of Mr. David Reich was to file an order sua sponte, stating that Ms. Hansen said she would not cooperate. This is clear intentional coercion and force by these individuals, and clearly a violation of ADA/ ADAAA and civil rights in a multitude of ways. This is retaliation by Mr. Reich.

77.    Moreover, Plaintiffs mental health was in fact, questioned by these Defendants and was continually discussed on the record and in open court. This created a hostile environment for the Plaintiffs.

78.    The Association of Family and Conciliation Courts (AFCC) promotes the use of "PA/PAS" and other mental health accusations against mothers and children in family courts.

79.    Richard Gardner, now deceased, fraternized with the Defendants in these organizations. Gardner was based in Bergan County, NJ and his discriminatory "PAS" theory has affected all women and children similarly situated to Ms. Wolf, Ms. Skipp, their children and all others similarly situated.

80.    Defendants have, at one time or another, been actively involved with the AFCC as members, board members, panel members, directors, lecturers, or through training, etc.

81.    During Plaintiff's litigation, these Defendants attended training sessions given by members of the AFCC

82.    Between 2011 through 2016 Donald Jorgensen, David E. Reich, Rodney Pagel and Dieterle ordered Plaintiffs into and through custody evaluations, parental coordinator meetings and the like with Barb Oliger, Allison Mahoney. The Court ordered Ms. Hansen to pay for half of these fees for the costs of the evaluator; and this was a forced and coerced contract. Whereby, if Ms. Hansen were to refuse, then they would aid in removing and withholding Ms. Hansen's child from her, and yet, that is what these individuals did by the coerced and forced use of these individuals.

83.    Due to the fraudulent malicious claims of Dieterle and Pagel and then further aided by the bias of Jorgensen and Reich, these Defendants collectively attempted to coerce and force Ms. Hansen into additional evaluations.

84.    The South Central Judicial District Court judge did not inform Ms. Hansen if any of the above named individuals nor the Court appointee to come, was vetted by the State of North Dakota to comply with anti-discrimination statutes.

85.   Barb Oliger and Allison Mahoney grilled Ms. Hansen and improperly, summarily interviewed Hansen's older daughters. Bard Oliger used "reports" to formulate their report that states that Ms. Hansen and B.D. had mental health issues relating to Parental Alienation inter alia.

86.   From 2011 through present, the Defendants discussed Ms. Hansen's mental health records and reports which are private records of Ms. Hansen and between her and her therapists only. In turn, they used this information against her and included in their written reports and filings. These reports, segments of reports and records were provided to the Court and Ms. Hansen's former husband, and discussed in open Court.

87.   "Threats to disclose or disclosure of disabled litigants' confidential information is a form of discrimination and violates the Constitutional right to privacy. The Constitution provides that no state shall deny to any person within its jurisdiction the equal protection of the laws and provides for Due Process of law. Disabled Litigants' right to confidentiality is inherent in the ADA/ADAAA statutory scheme as well as is protected under several federal and state laws, including the Health Insurance Portability Act (HIPAA). The ADA/ADAAA applied in conjunction with other federal laws, provides protection at a leval greater or equal to that provided by other federal and state laws, and prevails over any conflicting the ADA/ADAAA." ADA Title II Technical Assistance Manual, II-1.4200.

88.   This includes the manifestation of a disability, such as claims of alienation, are manifestations of Ms. Hansen's actual invisible disability of fibromyalgia and auto-immune disorder, PTS, PTSD.

89.   The Defendants' actions and inactions, most relevant are the prohibitions of 42 U.S.C. 12203-, which grossly manifested into physiological symptoms including nausea, nervous stomach, anxiety, fear, panic attacks, dizziness, memory issues. Ms. Hansen was visibly ill and was intentionally placed under extreme duress by these Defendants; had difficulty breathing and had to medicate herself, she was unable to cope or to communicate effectively in court; and unable to fully comprehend the proceedings. Ms. Hansen has even filed such on the record in the divorce and post-divorce docket.

90.  The State of North Dakota and its agencies, et. al. did not inform Ms. Hansen if Ms. Oliger, Ms. Mahoney or any of the others that Dieterle and Pagel attempted to force or did force upon Ms. Hansen and her child was vetted by the State of North Dakota to comply with anti-discrimination statutes.

91.  It is the policy of the State of North Dakota and its agencies to use "PAS" and other mental health accusations against women and children in family court proceedings. This policy has a disparate impact that adversely affects women and children.

92.  The State, Courts et. al., failed to inform Ms. Hansen of their policy to give preferential treatment to fathers, and that they were acting out of financial motivation, to obtain professional fees and federal "access" grants via The Healthy Marriage and Responsible Fatherhood (HMRF) initiative.

93.  The State and Courts of North Dakota et al., did not provide Ms. Hansen a full and equal opportunity to benefit from its available services in support of reunification with her daughter.

94.  Because Defendants regarded Ms. Hansen as having of "PAS," the Court was biased against her according to this sex-based stereotype. As a result, Plaintiffs could not fully and equally participate in court proceedings; and Ms. Hansen's parental rights were effectively terminated.

95.  The State of North Dakota and its Courts and state agencies involved social services and are obligated to make reasonable efforts to maintain the family unit and to prevent the unnecessary removal of a child from his or her home. They did not make those efforts on behalf of Ms. Hansen, however, they did continue to prove the bias for the father and against the mother, by Dakota Central Social Services (DCSS) granting full reunification efforts with Dieterle. Thus, continuing and proving the sex-based bias, but did not make those efforts in regards to Plaintiff's.

96.  Defendants did not refer Plaintiffs to a disability accommodations coordinator at the courthouse or at any other location, during the pendency of the family court civil proceedings, nor offer accommodations to the Plaintiffs. As a result, Plaintiffs could not fully and equally participate in court proceedings. Ms. Hansen even sent a request for such accommodations, and the Court Administrator, Donna Wonderlich scoffed at her, and immediately following this and

out of retaliation, Dieterle through his attorney, Pagel, sought through a motion to "limit" Ms. Hansen's access to the Courts, which Defendant Reich once again granted. There is a clear conspiracy of rights due to sex-based stereotype discrimination against Plaintiff's.

97.    The State of North Dakota and its Courts and agencies are inaccessible to Plaintiff Hansen and have caused injury to her and her child due to the above.

98.  Defendants faked the existence of a mental health impairment, namely "PAS," as a cause of action for segregating Plaintiff's and effectively terminating Ms. Hansen's parental rights.

99.  Defendants stereotyped and stigmatized Ms. Hansen and repeatedly acted on assumptions about Ms. Hansen's "PAS" mental impairment.

100.   Defendants perpetuated the use of "PAS" as a real syndrome to prejudice Ms. Hansen and other women in the family courts.

101.  State and Federal laws such as the Health Care Insurance Portability and Accountability Act of 1996 (HIPAA) provide that an individual has the right to privacy and nondiscrimination, the right to choose and decline their own healthcare providers, the right to a trusting relationship with their mental healthcare providers, and the right to Informed Consent.

102.  Further, the Fourth Amendment protects the right to privacy, and the Fifth Amendment protects an individual form being compelled to incriminate oneself. Yet, the above named Defendants, namely, Dieterle, Pagel, Jorgensen and Reich coerced, forced, manipulated and placed Ms. Hansen under extreme duress with their actions and statements against Ms. Hansen in their repeated attempts to intimidate Ms. Hansen into complying with their demands of several additional evaluations by a person whom she did not know and did not feel comfortable with, and this effectively terminated the parental rights of Ms. Hansen in complete violation of her civil rights.

103.  Because the Defendants exploited Plaintiff's disabilities, it has rendered Ms. Hansen with severe bouts of Fibromyalgia, severe auto-immune disorder, PTS and PTSD so severe that she does not trust them, has lost faith in the legal system, and cannot effectively communicate with them to retrieve and access her daughter.

104.  Ms. Hansen has experienced physiological impairments accompanying PTS/ PTSD that negatively affect major life activities and bodily functions, significant loss of sleep, depression, anxiety, difficulty concentrating, difficulty with thoughts and memory, difficulty breathing, inter alia. All of which has been brought on and exacerbated by the legal abuse of the State of North Dakota and these Defendants. Ms. Hansen has had to seek a significant amount of treatments to mitigate her conditions, such as therapy, medical visits and medications.

105.  PTS, PTSD is not curable. The duration and manifestation of Ms. Hansen's PTS/ PTSD are greater than six (6) months and are lifelong. Studies consistently show that individuals with PTS/PTSD have an increased risk of dying from coronary heart disease.

106.  In 2011 Judge Donald Jorgensen ordered Plaintiff's into custody evaluations with Barb Oliger to assess "PAS" for the use of him and to the benefit of Dieterle.

107.  Throughout litigation Dieterle with the aid of Pagel and Reich continued to throw around allegations of alienation, "PAS," to intentionally be used for the benefit of Dieterle to be placed as the custodial parent and so that the State of North Dakota and its courts and agencies could continue to benefit from the federal financial assistance from placing this child with the father.

108.  Later Ms. Hansen was forced by these Defendants to utilize and pay for the services of a parenting coordinator, Allison Mahoney, whom was selected by Defendant Judge Donald Jorgensen. Ms. Hansen did object to this and even contacted Ms. Mahoney and her supervisor, which Dieterle and Pagel then lashed out against Ms. Hansen for her not feeling comfortable with this person. Donald Jorgensen did have ex parte communications with Ms. Mahoney. Ms. Hansen objected to Ms. Mahoney due to lack of trust and stated so.

109.    Defendants did not inform Ms. Hansen if Ms. Mahoney was vetted by the State of North Dakota to comply with anti-discrimination statutes and failed to inform Ms. Hansen that Ms. Mahoney in fact was being paid by Ms. Hansen and the State of North Dakota for her position.

110.  The State of North Dakota and its agencies are inaccessible to Ms. Hansen.

111.  Rodney Pagel has a history of representing abusive men to harass their former domestic partners in court. North Dakota judges have a history of working with and taking training from

members of the AFCC. The two have established a pattern and practice with each other to remove children from their mothers by using claims of alienation, "PAS," inter alia.

112.   Rodney Pagel and his client Mr. Dieterle drilled on Ms. Hansen and her child that Ms. Hansen had mental health issues relating to "PAS," inter alia.

113.   In 2012 the court ordered Ms. Hansen into forced contact with Mr. Dieterle even against the protection order requirements and forced Ms. Hansen into negotiations of parenting time with Mr. Dieterle. This office of Ms. Mahoney is a state agency. The court ordered Ms. Hansen to pay half of the costs associated with this for this coordinator; and this was a forced and coerced contract.

114.   Defendants have failed to mitigate the ongoing harm complained of herein.

115.   Defendants Dieterle, Pagel and Reich have stated that Ms. Hansen has mental health issues relating to alienation, "PAS," inter alia.

116.   The Court has ordered Ms. Hansen to have supervised visitations based on the allegations of "PAS," to coincide solely with the requests of Mr. Dieterle, with Mr. Dieterle and Mr. Pagel making claims of "PAS" to effectively terminate Ms. Hansen's parental rights. These visits are supervised visits at a Bismarck visitation center, placing Plaintiffs in an inordinate amount of stress and have violated their right to privacy and their right to a relationship and association. The Family Safety Center is a state run agency, which further uses the "PAS" against mothers to obtain federal financial assistance.

117.   The Court has ordered that Ms. Hansen does not have any rights nor any rights of any contact with her child based upon the allegations of "PAS," stated by Mr. Dieterle and mimicked by Mr. Pagel and Reich. Ms. Hansen and her child have been forced into this situation and in fact have used this visitation center from the fall of 2015 until present, for a full two (2) years, which also is an agency of the state which also receives this federal financial assistance, in furtherance of the Responsible Fatherhood initiative.

118.   Ms. Hansen and her child have both been verbally and emotionally abused by the staff of this center, namely, Jamie, who refuses to give her last name in spite of several requests for it yet, if she speaks out against them, they will discontinue her visits. This is clear retaliation and is

in fact acting as a personal advocate of Mr. Dieterle, in the continuance of his deprivation of Ms. Hansen's rights to her daughter... all in the name of "PAS". Jamie has openly yelled at Ms. Hansen in front of her daughter during a visit for no reason. Jamie has openly advocated for Mr. Dieterle and against Ms. Hansen, and this is all due to the training of these individuals to discriminate against a mother through their use of "PAS" against moms.

119. Due to the constant abuses against Ms. Hansen and her PTS/PTSD Ms. Hansen does have a service dog, and this center has discriminated her for it. The staff, namely Jamie, Michelle and Diane have acted abusive towards Ms. Hansen and has threatened to not allow her her service dog during her visits. Which has only increased Ms. Hansen's anxiety and PTS/PTSD during these visits, due to the fear that these staff instill in Ms. Hansen.

120.    Ms. Hansen has been further harmed by the staff of the Family Safety Center, in that because Ms. Hansen has asked routinely for what is public information under the Federal Freedom of Information Act regarding the funding and policies of the FSC, and the staff has stonewalled every single time, Ms. Hansen has served upon the staff of the FSC Civil Investigative Demand notices. In response to these CID's Michelle E of the FSC has sent Ms. Hansen a letter stating she has decided to suspend any visits for Ms. Hansen and her daughter because of the Federal lawsuit naming the staff members as litigants. This is clear retaliation, admitted by Michelle E of the FSC.

121. Defendants Dieterle, Pagel and Reich have forced Ms. Hansen to utilize and pay for services at the Family Safety Center, yet, there isn't any record of any abuse from Ms. Hansen to her child, and there isn't any protection order in place against her by Mr. Dieterle. This is all due to the sex-based stereotype abuses of "PAS" as claimed by these Defendants.

122. Throughout parts of the divorce and custody proceedings Ms. Hansen and her children were unrepresented because Ms. Hansen could not afford nor locate an attorney and the court refused to appoint one, even for the child, to protect their interests.

123.    From 2011 through 2016, Ms. Hansen applied to the Legal Services of North Dakota programs for free and or reduced attorney fee programs multiple times for legal aid, and informed them of her circumstances and that of the issues with the courts and the accusations she was facing.

124.   LSND would routinely state that while Ms. Hansen qualified for services, that there wasn't anyone available to help her.

125.   Upon other instances wherein Ms. Hansen applied for legal aid she was told by the director that they did not provide services nor get involved with child custody litigation and child support litigation. However, it does assist and represent fathers in these matters, and accordingly receives federal funding via The Healthy Marriage and Responsible Fatherhood Initiative.

126.   For years, Ms. Hansen has been forced to proceed unrepresented, one such hearing, wherein she stated in open court that she required a continuance so that she was able to secure lawful representation, on March 5, 2015, and South Central Judicial District Court Judge, David E. Reich forced Ms. Hansen into and through a hearing without counsel, this is on the record and is in the transcripts. Because Ms. Hansen was forced, coerced and intimidated by Defendants Dieterle, Pagel and Reich, Ms. Hansen had no choice but to proceed unrepresented, and was unable to communicate effectively with the court due to her PTS/PTSD; history of domestic violence by her former husband; and the "PAS" against her and her child.

127.   After an exhaustive search, Ms. Hansen was able to hire Tim Hill of Fargo, North Dakota, to represent her. However, literally minutes before the hearing, Mr. Hill had several ex parte communications via meetings with Mr. Pagel and Mr. Reich.

128.   Against the wishes and statements of Ms. Hansen, Mr. Hill and Mr. Pagel forced and used intimidation and bribes to proceed with this hearing in the manner of which they together established. Ms. Hansen had stated to Mr. Hill several times that she did not agree to his proposal of Mr. Pagel's offering of more mental health evaluations, by someone she did not know of trust. In fact, during this hearing on or about November 12, 2015, Ms. Hansen had already submitted an evaluation by more than highly qualified forensic expert, on the record, and Mr. Pagel and Mr. Dieterle objected to this and to the testimony of this expert who was on hand for this hearing. In fact, Mr. Pagel, Mr. Dieterle and Mr. Reich worked in concert to intentionally block this expert from speaking up and providing testimony for Ms. Hansen, merely because it wasn't one of their paid off individuals who was working to further their schemes of "PAS."

129.   The Court forced her to proceed, and to agree to the terms that Mr. Pagel and Mr. Dieterle offered. Following this hearing Ms. Hansen emailed and filed a letter stating that she did

not comprehend nor did she agree to the terms. In retaliation, Mr. Reich filed an order that Ms. Hansen refused to "cooperate." This was a forced and coerced contract.

130.    This incident triggered Ms. Hansen's PTS/PTSD and immediately manifested into physiological symptoms including nausea, nervous stomach and anxiety due to the fear and triggers that this hearing set off. Ms. Hansen was visibly ill and under duress; had difficulty breathing, concentrating and comprehending and had to medicate herself with emergency medicine which she has been forced to carry on her at all times due to these instances. Due to this situation Ms. Hansen was unable to cope and communicate effectively in court; and was unable to fully comprehend the proceedings, and also unable to defend herself because of this.

131.    Yet, Judge Reich, Mr. Pagel and Mr. Dieterle demanded that Ms. Hansen proceed with the trial at that moment with no accommodations, and be subjected to their abuse. They did not allow her to present her testimony nor witnesses or evidence in her defense, all of which further triggered Ms. Hansen's PTS/PTSD and anxiety and was used against her in court by the Defendant's.

132.    Moreover, once again, true to form, Judge Reich was hostile and disrespectful towards Ms. Hansen during this proceeding as well as during the prior proceedings, and in fact, there is more than enough evidence in the transcripts of this and in Ms. Hansen's R.I.C.O. Complaint filed on August 23, 2017.

133.    Judge Reich effectively terminated Ms. Hansen's parental rights on September 4, 2015 via an ex parte communications and an ex parte order and has refused Ms. Hansen her rights to defend against the allegations of "PAS" made against her by Mr. Dieterle and Mr. Pagel, all of which are based upon Plaintiffs disabilities.

134.    Defendants intentionally prolonged litigation and used Plaintiff's disabilities and history of domestic violence which she suffered at the hands of her former husband to discriminate against and exploit Plaintiff's.

135.    By way of example, The South Central Judicial District Court forced and coerced Ms. Hansen into parenting coordination with her abusive former spouse for months beginning in 2012.

136.    Then in an attempt to further their allegations of "PAS" Defendants tried to coerce and force Ms. Hansen into several more mental health evaluations claiming it was the only way to be reunified with her child.

137.    On March 29, 2016 Ms. Hansen sent a request for ADA accommodations the Court Administrator, Defendant Donna Wunderlich. Ms. Wunderlich not only denied but in fact mocked Ms. Hansen's request for reasonable accommodations (i.e. that she have equal and fair access to the court and that she have one point of contact when dealing with the court.

138.    In retaliation, on March 30, 2016 Mr. Dieterle and Mr. Pagel then file to limit Ms. Hansen's access to the court. This motion allows Ms. Hansen fourteen (14) days in which to respond. The very next day Ms. Hansen hand delivers to the Sheridan County clerk of court, Defendants Kathy Mindt and Sylvia Schell, her response to this motion to limit, and the clerk tells Ms. Hansen that she will have to ask Judge Reich if Ms. Hansen is allowed to file. This was so abusive and damaging that this caused Ms. Hansen severe mental health issues and triggered her PTS/PTSD, of which she sought emergency health treatment afterwards.

139.    Ms. Hansen had Mr. Dieterle, Mr. Pagel and Mr. Reich lawfully served her Lawsuit of Claim of Trespass via Sheriff's service on April 6, 2016, due to the abuses against her and the violations of her rights. Once again, each of these Defendants named herein retaliated against Ms. Hansen, namely, Mr. Reich, wherein he issued an Order to limit Ms. Hansen's lawful access to the Court on April 12, 2016, but in this Order states that Mr. Dieterle may file, while Ms. Hansen may not. Clearly this is bias and discrimination due to the sex-based stereotypes discrimination and the "PAS" disability. Defendant Judge David E. Reich stated in his order that Ms. Hansen could not file without his approval. And because of this, the Sheridan County Clerks of Court, Defendants Ms. Mindt and Ms. Schell, refuse to allow Ms. Hansen her right to file, in violations of the Constitution and her civil rights.

140.    Ms. Hansen has Post Traumatic Syndrome caused by the legal system failure to protect her and her children from the domestic violence and the abusive litigation, or Legal Abuse Syndrome. Ms. Hansen has made efforts to inform the court of this, however, her right to file has been violated.

141.   From 2012 on, individuals concerned about the child being forcibly removed from Ms. Hansen by her former husband, including but not limited to, Ms. Goven, Nurse Practitioner, and Mr. Steve Lee, McLean County Commissioner and DCSS board member made complaints to Dakota Central Social Services via phone calls and letters, because of the abuses to child, B.D. by Mr. Dieterle. Much of this being psychological abuse, and all of which was by the father, Mr. Dieterle.

142.   North Dakota state agencies, believe in and utilize training and standards taught and enforced by AFCC of alienation. Thus, the social workers were being trained to discriminate against women.

143.   Due to the actions of Mr. Dieterle aided by his counsel, Mr. Pagel, the child, B.D. was taken into foster care by Social Services in September 2014. Social Services terminated Mr. Dieterle's custodial rights, but worked to reunite this child with him, meanwhile withholding this child from the care and custody of Ms. Hansen while claiming "PAS" against Ms. Hansen. Dakota Central Social Services offered and provided services to Mr. Dieterle yet, failed to assist Ms. Hansen, due to their accusations of "PAS."

144.   DCSS did not share information with Ms. Hansen, instead, Ms. Hansen was kept from any and all information regarding her child during this time.

145.   Mr. Steve Lee was concerned for this child and had a meeting with DCSS Director, Steve Reiser, expressing his concerns regarding this child being taken away from Ms. Hansen and put into foster care due to the actions of Mr. Dieterle. In response, Steve Reiser, director of DCSS, also recipient of financial assistance and AFCC training practices and influenced and trained to believe in "PAS" went to McLean County State's attorney, Defendant Ladd Erickson. The retaliation of this was that Mr. Erickson called for a meeting and tried to force Mr. Steve Lee off of the board in retaliation of his speaking up for Ms. Hansen's daughter. Mr. Erickson and his office is trained to discriminate against women and make claims of "PAS."

146.   Mr. Ladd Erickson is a recipient of federal financial aid.

147.   DCSS together in assistance to services for Mr. Dieterle assigned Ms. Alana Semchenko as a mental health provider for Ms. Hansen's daughter, B.D. However, DCSS did not inform Ms.

Hansen is this mental health provider was vetted by the State of North Dakota to comply with anti-discrimination statutes.

148.    Services by Alana Semchenko were never provided to Ms. Hansen. Ms. Semchenko was completely resistant to Ms. Hansen wanting to be involved with the sessions and made remarks to Ms. Hansen about this.

149.    Ms. Hansen reached out to Ms. Semchenko and asked why she had not contacted her. Whereupon, Ms. Semchenko told Ms. Hansen that she was hired to provide services on behalf of Mr. Dieterle and the child.

150.    It appears that.. this counselor…. Entered into contractual agreements here to obtain federal "access" grants via The Healthy Marriage and Responsible Fatherhood Initiative and that is why Ms. Hansen was excluded from participating in their programs and services.

151.    Due to the continued abuses to Ms. Hansen and B.D. Ms. Hansen called DCSS and asked for assistance and to discuss matters. Ms. Hansen sent letters to DCSS because DCSS refused to take calls from Ms. Hansen. Ms. Hansen reached out to the director, Steve Reiser, who refused to answer questions or offer assistance. Mr. Reiser and Sarah made threats to withhold any programs and even stated that they did not have programs available to her, but only to Mr. Dieterle and B.D.

152.    This is clearly sex-based stereotype discrimination and further belief in and alignment with "PAS" by DCSS.

153.    B.D.s nurse practitioner, Ms. Jill Goven wrote a letter to DCSS voicing her concerns regarding the care and custody of B.D. being placed with Mr. Dieterle, and the only reply was a statement that it was a "custody issue" and that they do not get involved with custody issues. Ms. Goven's concern was for B.D. and Mr. Dieterle withholding her from Ms. Hansen.

154.    Other individuals made complaints to DCSS in favor of Ms. Hansen and their concern of B.D. being taken from her and yet not one person of DCSS cared about this child and the concerns that were voiced by other individuals. This discrimination is due to the AFCC training and stereotyping using "PAS" against mothers.

155.    In further discrimination and retaliation, DCSS staff had ex parte communications with judge Reich and Mr. Pagel, claiming "PAS" against Ms. Hansen.

156.    On more than one occasion, Ms. Hansen has sent complaints and has made requests to speak with members of the Judicial Conduct Commission regarding the discrimination and bias however, each time the JCC refused to provide remedy.

157.    The South Central Judicial District Court, DCSS, and the North Dakota Supreme Courts and its clerks did not provide Ms. Hansen a full and equal opportunity to benefit from its services in support of reunification with her child.

158.    The South Central Judicial District Court, the North Dakota Supreme Court, and Dakota Central Social Services are obligated to make reasonable efforts to maintain the family unit and to prevent the unnecessary removal of a child from his or her home. They did not make those efforts in regards to Plaintiff's.

159.    On more than one occasion Ms. Hansen has filed and tried to file Motions and Writs accompanied by exhibits to the North Dakota Supreme Court expressing her grievances, the bias and discriminations of the District Court judge, Defendant David E. Reich. All of whom refused to provide remedy and uphold Ms. Hansen's rights.

160.    Defendant Judge David E. Reich retaliated against Ms. Hansen more than once, even going so far as to barring Ms. Hansen from contact with her daughter via an ex parte motion/ order. In a prior proceeding, wherein Mr. Reich stated he would decide what he would and would not hear in open court in regards to Ms. Hansen's motions to recuse him... he stated angrily in open court that he knew Ms. Hansen filed to have him recused...and accused him of bias. Again, he retaliated, and discriminated against Ms. Hansen and he refused to recuse himself.

161.    Judge Reich stated that Ms. Hansen could only see the child based solely upon Mr. Dieterle's demands. Of one two hour visit per month supervised at the center where Mr. Dieterle chose according to the specific terms that Mr. Dieterle chose, all of which were based upon the accusations, discrimination and claims of "PAS" being used against Ms. Hansen.

162.   Due to the actions of Mr. Dieterle, Mr. Pagel and Mr. Reich, Ms. Hansen has been denied access to her daughter's school and to interact with her daughter at her school or on the telephone, all due to the allegations of "PAS" being used against Ms. Hansen.

163.   The State of North Dakota and its agencies are inaccessible to Plaintiff/ Injured party Angela Hansen.

164.   Because the Defendants exploited Plaintiffs' disabilities, it has rendered Angela Hansen's PTSD so severe that she does not trust them, has lost faith in the legal system, and cannot effectively communicate with them to retrieve and access her child.

165.   Ms. Hansen has experienced physiological impairments accompanying PTSD that negatively affect major life activities and bodily functions – significant loss of sleep, depression, anxiety, difficulty concentrating, severe neurological pain due to an auto-immune disorder and difficulty breathing, inter alia brought on by the abuses of this system. Ms. Hansen has had to seek a significant amount of medical treatment to mitigate her condition, visits therapy, medications, and supplements.

166.   Fibromyalgia is not curable and Ms. Hansen's condition has been exacerbated by the PTSD.

167.   Ms. Hansen's auto-immune disorder and neurological pain is not curable and has been exacerbated by the PTSD and the LAS.

168.   Plaintiff's reserve the right to expand and modify these proceedings.

## CAUSE OF ACTION

## COUNT 1

### TITLES II AND III OF THE AMERICANS WITH DISABILITIES ACT

169.   Paragraphs 1 through 168 are re-alleged and reasserted as if fully set forth here.

170.   Angela Hansen is an individual with PTSD, LAS, fibromyalgia and an auto-immune disorder; and regarded by Defendants as an individual having "PAS" and other mental health issues. She required appropriate individualized treatment and accommodations necessary to ensure full and equal access to court proceedings concerning her parental rights and the custody

of her minor child B.D.; accordingly, she is a qualified individual with a disability as defined by 42 U.S.C. §§ 12102 and 12131(2). PTSD is listed under "predictable assessments" under the ADA and its implementing regulation. Plaintiff's disabilities must be assessed without regard to mitigating measures.

171.   B.D. is a minor child <u>regarded</u> by Defendants as an individual having "PAS." She required appropriate individualized treatment and accommodations necessary to ensure full and equal access to court proceedings concerning her custody and her mother's parental rights; accordingly, they are each a qualified individual with a disability as defined by 42 U.S.C. §§ 12102 and 12131(2). Plaintiff's disabilities must be assessed without regard to mitigating measures.

172.   Because of the actions complained of herein occurred from 2011 through the present, the greatly expanded definition of the ADA Amendments Act of 2008, Final Rule of 2016, and parallel State law changes apply.

173.   Ms. Hansen's PTSD, fibromyalgia and auto-immune disorder fall under actual mental impairment/ psychiatric injury and physiological impairment, which substantially limit one or more major life activities. Ms. Hansen has records of such impairments.

174.   Plaintiffs' "PAS" and mental health issues disabilities fall under the greatly expended *regarded as* prong of the ADA. Ms. Hansen has court records of such perceived mental impairments.

175.   *Major life activities* and *substantial limitations* are to be construed as broadly as possible under the ADAAA and its implementing regulations.

176.   Under the ADAAA, "major life activities" include "major bodily functions."

177.   Plaintiffs do not have to identify any major life activity or bodily functions that are substantially limited, under the ADAAA and its implementing regulations, but have.

178.   Defendants have subjected Plaintiffs to an ongoing mental war zone since 2011 to present. The U.S. military does not send any personnel on a tour lasting over 278 days as it is found to cause harm.

179.  Each day that passes adds incremental harm. Ms. Hansen's PTSD cannot be treated until the ongoing trauma ends. A mitigating measure and remedy would require the restoration of Plaintiff child to Plaintiff mother.

180.  Defendants have failed to mitigate the harm they have done to Plaintiff's.

181.  Unmitigated harm is a continuing cause of action.

182.  Ms. Hansen fighting for her child is a major life activity. The State of North Dakota should cede to mitigate further harm.

183.  Defendants, State of North Dakota, Burleigh County, Sheridan County, Dakota Central Social Services, judges, clerks, sheriffs, deputies it agencies and departments, Mr. Pagel, Richard Riha, Wayne Stenhehem, Ladd Erickson, Diane Zainhofsky, Family Safety Center, Legal Services of North Dakota are a government, public entity; accordingly, Defendants are public entities as defined in 42 U.S.C. § 12131(1).

184.  Defendants Pagel, Dieterle, Pulkrabek, Ms. Semchenko, Diane Zainhofsky, Michelle E, Jamie (Doe) Sarah (Doe) Mr. Reiser are private entities within the meaning of 42 U.S.C. § 12181.

185.  Defendants are subject to both Title II and Title III of the ADA because of contractual arrangements.

186.  Title II of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

187.  Title III of the ADA, 42 U.S.C. §12182, provides that: " No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."

188.  Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(ii), provides that: "It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or

disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals."

189.    Defendants removed Ms. Hansen's child from her custody and effectively terminated her parental rights based on regarding her as having "PAS" and the sex-based stereotype of that "mental impairment"; regarding her as having mental health issues and based on Ms. Hansen's PTSD and assumptions about this mental impairment. As a result, B.D. has been discriminated against on the basis of her association with an individual with a disability.

190.    Defendants have intentionally discriminated against Plaintiffs as qualified individuals with disabilities, on the basis and stereotypical assumptions of those disabilities, and through contractual arrangements, in the full and equal opportunity of their services, programs, activities, facilities, privileges, advantages, and accommodations in violation of Title II of the ADA, as amended, 42 U.S.C. § 12131 et seq., and its implementing regulation at 28 C.F.R. Parts 35; Title III of the ADA, as amended, 42 U.S.C. §12181 et seq., and its implementing regulation at 28 C.F.R. Parts 36, by inter alia:

a.    denying Plaintiffs the opportunity to participate in or benefit from Defendants' services, programs, activities, facilities, privileges, advantages, and accommodations in violation of 28 C.F.R. § 35.130(b)(1)(i); and 28  C.F.R. §§ 36.201, 36.202 and 36.203.

b.    denying Plaintiffs an opportunity to participate in or benefit from Defendants' services, programs, activities, facilities, privileges, advantages, and accommodations that is not equal to that afforded to Ms. Hansen's former husband, in violation of 28 C.F.R. § 35.130(b)(1)(ii); and 28 C.F.R. §§ 36.201, 36.202;

c.    limiting Plaintiffs in the enjoyment of the rights, privileges, advantages, or opportunities enjoyed by Ms. Hansen's former husband, in violation of 28 C.F.R. § 35.130(b)(1)(vii); and 28 C.F.R. §§ 36.201, 36.202;

d.    utilizing criteria or methods of administration that had the effect of subjecting an individual with a disability to discrimination on the basis of a disability or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of Defendants'

services, programs, and activities with respect to individuals with disabilities, in violation of 28 C.F.R. § 35.130(b)(3); and 28 C.F.R. §§ 36.301(a) and 36.204;

e.      selecting vendors, forcing/coercing Plaintiffs into, and entering into, contractual arrangements to be used to evaluate Plaintiffs' mental health that had the effect of excluding Plaintiffs from, denying them the benefits of, or otherwise subjecting them to discrimination and disparate treatment, or that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' services, programs, and activities with respect to individuals with disabilities, in violation of 28 C.F.R. § 35.130(b)(1)(v) and (b)(4); and 28 C.F.R. §§ 36.201, 36.202 and 36.203.

f.      failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the Defendants can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity, in violation of 28 C.F.R. § 35.130(b)(7); and 28 C.F.R. § 36.302;

g.      failing to administer Defendants' services, programs, and activities in the most integrated setting appropriate to the needs of persons with disabilities, in violation of 28 C.F.R. § 35.130(d) and 28 C.F.R. 36.203;

h.      failing to operate Defendants' services, programs, activities, and facilities so that, when viewed in its entirety, it is readily accessible to and usable by mothers and their children, in the most integrated setting appropriate, in violation of 28 C.F.R. §§ 35.150 and 35.151 and 28 C.F.R. § 362.0;

i.      refusing to provide and offer appropriate individualized treatment and accommodations necessary to ensure full and equal opportunity for Ms. Hansen and her child to participate in Defendants' programs, services and activities;

j.      stereotyping and stigmatizing Ms. Hansen and repeatedly acting on assumptions about Ms. Hansen's disabilities in violation of 28 C.F.R. § 35.130(h) and 28 C.F.R. § 36.301(b);

k.    perpetuating the use of "Parental Alienation Syndrome" as a real syndrome to prejudice Ms. Hansen and other women in the family courts in violation of 28 C.F.R. § 35.130(b)(1)(v) and 28 C.F.R. § 36.301;

l.    excluding or otherwise denying equal services, programs or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association with, in violation of 28 C.F.R. § 35.130(g);

m.    depriving the Plaintiffs of their honest services;

n.    blocking representation by an attorney for Plaintiffs to protect their rights;

o.    Segregating Plaintiffs from each other based on disability;

p.    Blocking Plaintiffs from filing for grievances;

q.    effectively terminating Ms. Hansen's parental rights based on disability and sex;

r.    retaliating against Plaintiffs in violation of 28 C.F.R. § 35.134;

s.    failing to mitigate the harm that continues to the present.

191.    As a result of Defendants actions and inactions, Ms. Hansen and her child B.D. are persons aggrieved who have been injured and suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

192.    A judge is not immune for tortious acts committed in a purely administrative, non-judicial capacity. Forrester v. White, 484 U.S. at 227-229, 108 S. Ct. at 544-545; Stump v. Sparkman, 435 U.S. at 380, 98 S. Ct. at 1106. Mireles v. Waco, 112 S.Ct. 286 at 288 (1991).

193.    A state forfeits its sovereign immunity upon accepting the funding under section 504 of the Rehabilitation Act of 1973. Any immunity is abrogated.

194.    The Defendants in this section have not done self-evaluation of their agencies, policies interagency agreements, etc. per § 35.105 Self-evaluation.

COUNT II

SECTION 504 OF THE REHABILITATION ACT

195.    Paragraphs 1 through 194 are re-alleged and reasserted as if fully set forth here.

196.    Ms. Angela Hansen is an individual with PTSD, Fibromyalgia, and auto-immune disorder and regarded by Defendants as an individual having "PAS" and mental health issues. She required appropriate individualized treatment, accommodations, and full and equal access to court proceedings concerning her parental rights and the custody of her minor child B.D.; accordingly, she is a qualified individual with a disability.

197.    B.D. is a minor child regarded by Defendants as an individual having "PAS", when in fact it is stated by a forensic expert Mr. Doctor Ascano and a highly regarded multi-faceted expert, Ms. Autumn Ascano, and an additional professional to having separation anxiety issues, and adjustment disorder. Ms. Hansen and B.D., required appropriate individualized treatment, accommodations, and full and equal access to court proceedings concerning her custody and her mother's parental rights; accordingly, they are each a qualified individual with a disability.

198.    Defendants are the recipients of federal financial assistance.

199.    The Healthy Marriage and Responsible Fatherhood (HMRD) initiative is a $ 150 million discretionary grant program originally authorized under the Deficit Reduction Act of 2005 and reauthorized under the Claims Resolution Act of 2010.

200.    The State of North Dakota, et al, have a policy and *modus operandi* of discriminating against mothers, particularly <u>single</u> mothers and victims of domestic violence, in order to receive federal grants via The Healthy Marriage and Responsible Fatherhood (HMRF) initiative. Defendants pit Responsible Fatherhood against the Violence Against Women Act (VAWA) to generate a cyclical need for funding.

201.    Defendants have a pattern and practice of using mental health accusations and discriminatory policies, namely "PAS," "alienation" against mothers and children to achieve the foal of getting federal funding via HMRF.

202.    Defendants here used Ms. Hansen's family to obtain federal "access" grants via Fatherhood funding to further discriminate against Ms. Hansen and her daughter. Defendants gave Ms. Hansen's former husband more access to the child to the extent where Ms. Hansen's

access to her daughter was completely taken away based on her disabilities and sex-based stereotypes of those disabilities.

203.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that no qualified individual with a disability, solely by the reason of his or her disability, may "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any programs or activity receiving Federal financial assistance."

204.    Defendants have discriminated intentionally against Plaintiffs be refusing appropriate individualized treatment and accommodations necessary to ensure full and equal opportunity for Plaintiffs to participate in Defendants' programs in violation of Section 504 if the Rehabilitation Act, 29 U.S.C. § 794.

205.    As a result of Defendants' actions and inactions, Ms. Hansen and her daughter, B.D., are persons aggrieved who have been injured and suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

206.    Picking v. Pennsylvania R. Co. 151 Fed. 2nd 240; Pucket v. Coz 456 2nd 233, Pro se pleadings are to be liberally construed and are to be considered without regard to technicality; pro se litigants pleadings are not to be held to the same high standards of perfection as lawyers. Plaintiffs require the accommodations or reasonable modifications of counsel.

## **Prayer for Relief**

WHEREFORE, Plaintiffs/ Injured Parties demand judgment against Defendants for the following:

207.    Declare that Defendants have violated Title II of the ADA, 42 U.S.C. § 12131 et seq., and its implementing regulation, 28 C.F.R. Part 35; Title III of the ADA, 42 U.S.C. § 12181 et seq., and its implementing regulation, 28 C.F.R. Part 36; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

208.    Enjoin Defendants, their officers, agents and employees, and all other persons in active concert or participation with Defendants, as well as any successors or assigns, from engaging in discriminatory policies and practices against individuals based on their disabilities and

specifically from failing or refusing to take appropriate steps to ensure compliance with the requirements of Title II of the ADA, 42 U.S.C. § 12131 et seq., and its implementing regulations, 28 C.F.R. Part 35; Title III of the ADA, 42 U.S.C. § 12181 et seq., and its implementing regulations, 28 C.F.R. Part 36 and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

209.    The Plaintiffs' are providing Judicial Notice: "a parent who is a party to the lawsuit who has the same interests as the child is a proper representative under Fed. R. Civ. P. 17(c), See generally T.W. by Enk v. Brophy, 124 F.3d 893, 895-97 (7th Cir. 1997); see also In Re Chicago, Rock Island & Pac. R.R. Co., 788 F.2d 1280, 1282 (7th Cir. 1986).

210.    Order Defendants to modify their policies, practices and procedures as necessary to bring them into compliance with Title II of the ADA, 42 U.S.C. § 12131 et seq., and its implementing regulations, 28 C.F.R. Part 35; Title III of the ADA, 42 U.S.C. § 12181 et seq., and its implementing regulations, 28 C.F.R. Part 36; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

211.    Order the Defendants, their agents and successors in office, and all persons acting in concert with the Defendants to promptly remedy the demonstrated violations of Title II of the ADA and its implementing regulations, and mitigate harm to Plaintiffs;

212.    Terminate Defendants' Federal financial assistance;

213.    Assess a civil penalty against Defendants as authorized by 42 U.S.C. § 12188(b)(2)(C) to vindicate the public interest;

214.    To reimburse Ms. Hansen for the expenses incurred for litigation including post litigation.

215.    To reimburse Ms. Hansen for the expenses she has incurred by the Family Safety Center;

216.    To award compensatory and punitive damages to Plaintiffs; amount to be determined at trial.

217.    To award reimbursement of Plaintiffs' attorney's fees and costs;

218.    To award reimbursement of fees due to the losses caused by the Defendants against Plaintiffs, such as costs associated with bringing forth this case.

219.    To award injunctive relief, restoration of Plaintiff child to Plaintiff mother.

220.    Declaratory relief requiring all orders issued after October 19, 2011 to date are declared null and void. As such unlawful orders are void and unenforceable and can be challenged in any court at any time.

221.    Order such other appropriate relief as the interests of justice require.

**Certification and closing:**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this *Complaint /Claim for violation of ADA, etc.* (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _Nov 2, 2017_

Autograph of Plaintiff/ Aggrieved Party _Angie Hansen_

Printed Name of Plaintiff/ Aggrieved Party _Angie Hansen_

Address:    P.O. Box 84
            Cowdrey, Colorado, 80434

<u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by Jury of all issues so triable.

Respectfully submitted,

Date: _November 2, 2017_        _Angie Hansen_

Angela Hansen

Subscribed and sworn, without prejudice, and with all rights reserved,

Angela Hansen
P.O. Box 84
Cowdrey, CO. 80434

*Angie Hansen*

Principal, by Special Appearance, in Propria Persona, proceeding Sui Juris. (Not for entrance into any foreign jurisdiction.)

My Hand and Mark as Subscriber        (AUTOGRAPH NAME BELOW)

Date: Nov 2, 2017 _____ Common Law Seal: _____

On this _2nd_ day of November , 2017, before me, the undersigned, a Notary Public in and for Colorado, personally appeared the above-signed, known to me to be the one whose name is signed on this instrument, and has acknowledged to me that she has executed the same. (Wyoming)

Autograph By: _____

Printed Name: FELIX J KING _____

Date: NOVEMBER 2ND 2017 _____

My Commission Expires: 12/29/2019 _____

FELIX J KING - NOTARY PUBLIC
County of Albany    State of Wyoming
My Commission Expires December 29, 2019

*Using a notary on this document constitutes an adhesion in Equity. It does not alter my status in any manner. The purpose for the notary is verification and identification only not for entrance into ANY Foreign Jurisdiction.*

I declare under penalty of perjury that the statements I have made in this *Complaint/Claim for* are true and correct to the best of my knowledge. *Violations of ADA,*

Executor of this Instrument *Violations of Sect 504 of the Rehab Act*

Printed Name _Angie Hansen_    Date _NOV 2, 2017_

Autograph _Angie Hansen_

Address _P.O. Box 84_    City _Cowdrey_

State _Colorado_    Zipcode _80434_

Witness

Sign in Red Ink only

Before me, _FELIX J KING_, the subscriber, personally appeared _ANGIE HANSEN_.

To me known to be the Living Soul described in and who executed the foregoing instrument and sworn before me that they executed the same as their own free will act and deed. State of ~~Colorado~~ _WYOMING_, County of ~~Jackson~~ _ALBANY_.

Witness Autograph _____

Date _November 2nd, 2017_

FELIX J KING - NOTARY PUBLIC
County of Albany    State of Wyoming
My Commission Expires December 29, 2019

*Using a notary on this document constitutes an adhesion.[it does not alter my status in any manner.]The purpose for the notary is verification and identification only. [Not for entrance into ANY Foreign Jurisdiction.] This is a Self Executing Contract if No Response is Received within 10 Business days of Receipt.*